*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MANDY PECHER,

        Plaintiff-Appellant/Cross-Appellee,

v

JOSEF GREGOR HABSCHEID,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
July 20, 2023

No. 361496
Midland Circuit Court
LC No. 2019-006266-DM

Before: M. J. KELLY, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

Plaintiff, Mandy Pecher, appeals as of right the judgment of divorce entered by the trial court. Defendant, Josef Habscheid, cross-appeals the same order. For the reasons stated in this report, we affirm in part and reverse in part and remand for further proceedings related to the distribution of the actually received tax refunds and to the calculation of child support.

## I. BASIC FACTS

The parties married on December 27, 1999 in the Federal Republic of Germany. During the marriage, Pecher obtained her German law license, the parties immigrated to the United States, and Pecher was eventually admitted to the Michigan bar. With Habscheid's assistance, Pecher began a law practice with offices in Michigan and Germany. Habscheid also started his own internet-based marketing business. Eventually that business was dissolved and he formed additional internet-based businesses. In 2006, the parties' first child was born. Their second child was born in 2008. Eventually, the marriage relationship began to deteriorate. The parties had disputes over financial issues and child rearing. There were also accusations of domestic violence. Pecher eventually contacted a divorce lawyer in 2019. She planned to file for divorce after the parties and their children returned from their annual summer trip to Germany. Before the complaint for divorce was filed, however, Habscheid physically assaulted her. Thereafter, she filed for divorce in May 2019.

One of the primary issues during the lower court proceedings was related to the physical and legal custody of the children; however, neither party is appealing the court's decision to award them joint legal and physical custody. Rather, the issues on appeal relate almost exclusively to the

distribution of the marital estate. During the marriage, the parties acquired two parcels of real property: the marital home and an office building. They entered into a partial property settlement during the divorce proceedings that awarded the house to Pecher and the office building to Habscheid, but they could not agree on the value of either parcel. The parties also each had brokerage accounts, personal bank accounts in the United States and in Germany, business bank accounts in the United States and Germany, and retirement accounts in the United States and in Germany. Other marital assets included Pecher's law practice and Habscheid's internet-based marketing businesses.

With regard to the property division, Pecher argued that, based upon Habscheid's fault leading to the breakdown of the marriage, it would be fair and equitable to split the property 55/45 in her favor. Habscheid generally denied fault and argued that the assets should be split 50/50. The parties did not agree on the value of many of the assets. Relevant to the issues raised on appeal, they disputed the value of Pecher's law practice and the marital home. Pecher presented expert testimony from Michael Harter regarding the value of her business, but his testimony was eventually excluded under MRE 703. Habscheid testified as to what he believed the business was worth based upon his own review of the tax returns and bank statements. Also relevant to the law practice, Habscheid presented evidence suggesting that Pecher had prepaid and overpaid her German taxes before filing the complaint for divorce. He opined that she would receive a full refund within four years and he presented evidence showing that she had already received approximately 15,500 euros in refunds. He also believed that during the marriage she deliberately delayed billing her clients, which resulted in thousands of dollars in accounts receivable not being discovered until trial. He asked the court to award him half the value of the accounts receivable. The parties also disputed the manner of dividing Pecher's German statutory pension, which was called the Rechsanwaltsversongungswerk (RVW).[1] Habscheid favored receiving an equalization of its current value and Pecher argued in favor of Habscheid receiving his marital share of the monthly retirement benefit once he turned 66 ½. Both parties wanted certain personal property, and, although an appraisal of the personal property had been prepared and admitted into evidence, Habscheid wanted to value the personal property by holding a silent auction between the parties. Another dispute involved the valuation date for the brokerage accounts. Finally, Habscheid requested attorney fees under MCR 3.206(D)(1)(b) based upon Pecher's alleged failure to comply with a previous court order.

Following the divorce trial, the trial court determined that, generally, a 50/50 split of the assets was fair and equitable. The court assigned a value to the marital home and the parties businesses and determined that the valuation date for the brokerage accounts would be the date of the divorce. The court found that the proofs regarding the tax refunds and the accounts receivable was speculative and did not include them in the property division. The court ordered that the parties were to keep their retirement accounts—including Pecher's RVW account—free and clear of any claim by the other but were to equalize the marital value of the accounts. The court denied Habscheid's request for attorney fees. Finally, with regard to the personal property, the court ordered each party to retain the property in their possession, to exchange certain items, and stated

---

[1] Pecher described the account as the equivalent of Social Security in the United States, and she explained that as a German lawyer she was required to contribute to it.

that they could bring future disputes to the court for resolution. Both parties eventually disputed the property award, and the court entered a postjudgment order further dividing the property and ordering that no money be exchanged between the parties related to the personal property.

Following entry of the judgment of divorce, the trial court determined that it would be appropriate to use the "numbers from the judgement of divorce" to calculate child support. Further, the court denied a second motion by Habscheid seeking attorney fees under MCR 3.206(D)(1)(a).

This appeal follows.

## II. EXCLUSION OF EXPERT TESTIMONY

## A. STANDARD OF REVIEW

Pecher argues that the trial court abused its discretion by excluding Harter's business-valuation report and expert testimony on the value of her law practice. Decisions regarding the admission of evidence are reviewed for an abuse of discretion. *Reed v Reed*, 265 Mich App 131, 160; 693 NW2d 825 (2005).

## B. ANALYSIS

The facts underlying an expert's opinion are required to be in evidence. *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 732; 761 NW2d 454 (2008). MRE 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence hereafter.

Prior to trial, Habscheid filed a motion to exclude Harter's business-valuation report and expert testimony under MRE 703. He argued that the facts and data necessary to value Pecher's business had been requested but not produced during discovery. The court denied the motion, ordering that any documentation upon which Harter was basing his opinion should be provided to Habscheid's lawyer prior to cross examination. The court, however, also clarified that under MRE 703, "those things must be in evidence, not just admissible." Later, during the direct examination, Pecher's lawyer sought to admit Harter's business-valuation report as an exhibit. The court admitted the report "contingent on the idea that all of this stuff is in evidence, in fact."

After Pecher closed her case-in-chief Habscheid brought an amended motion to exclude Harter's testimony. He argued that the facts and data Harter had based his opinion on had not been admitted into evidence and that not all the documentation had not been turned over during discovery. Pecher's lawyer admitted that the facts and data were not in evidence and that some of the documentation Harter relied upon had not been turned over during discovery. He suggested that, under MRE 611(a), the court could allow him to reopen the proofs to admit the facts and data or it could simply allow him to admit it during redirect examination of Harter. The court declined to reopen the proofs, however, and it granted the motion to exclude Harter's expert business-valuation testimony.

On appeal, Pecher contends that, although the facts and data upon which Harter based his opinion were not introduced into evidence, the data he relied upon was admissible and could have been introduced into evidence. While it is true that the facts or data upon which an expert relies upon must be admissible evidence, see *People v Fackelman*, 489 Mich 515, 534; 802 NW2d 552 (2011) (quotation marks omitted), that is not the only requirement set forth in MRE 703. Rather, the rule expressly provides that such facts or data "shall be in evidence." MRE 703. Here, because at least some of the facts and data upon which Harter based his opinion were not admitted into evidence, the trial court did not abuse its discretion by excluding Harter's testimony under MRE 703.

Pecher suggests that she was prejudiced because the court initially allowed Harter to testify without also requiring that the facts or data supporting his opinion to be in evidence. Then, months later, when Habscheid brought the "same" motion, the court granted it. She ignores that the facts changed between when Habscheid brought the first motion and the second motion; thus, they were only similar motions. In any event, Pecher suggests that the court's decision on the second motion resulted in prejudice to her because, if she had known that the facts or data had to be in evidence, she would have "painstakingly" ensured that the relevant documents be admitted. Pecher misses the point. Her argument is essentially that it is unfair to exclude her expert based upon her failure to comply with MRE 703 because, at the time of trial, she was unaware that she would have to comply with the rule.[2] However, under MRE 703, the facts and data upon which an expert relies may be admitted after the expert testifies. Thus, when Habscheid first objected to Harter's testimony it was possible that the facts and data would have subsequently been admitted through another witness. The court, therefore, did not err by denying the motion to exclude at that time. Subsequently, Pecher did not offer that testimony or documentation because she determined that such testimony would be cumulative to Harter's testimony. Thus, at the time that Habscheid brought his second motion, it was clear that the facts and data were not all in evidence. The court, therefore, did not arbitrarily change its position on the admissibility of Harter's testimony; instead, it made a different ruling based upon the change in the underlying facts. Consequently, notwithstanding that the court's ruling prejudiced Pecher, the prejudice was not unfair.

Pecher suggests that she could have admitted the evidence if the court had exercised its discretion under MRE 611(a), which provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless

---

[2] Pecher's contention that she did not fully realize that she had to admit the facts and data into evidence is not entirely unsupported. The court made comments suggesting that the tax returns would not have to be admitted into evidence. Yet, those comments were consistently tempered by the court's warning that MRE 703 would have to be complied with and the facts would have to be admitted—somehow—into evidence. Additionally, Harter did not just rely on tax returns; Pecher's lawyer admitted that he did not ask Pecher certain questions because Harter had already testified to the information. It appears, therefore, that regardless of potential confusion related to the tax returns, Pecher made a tactical choice not to enter certain information into evidence.

consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Pecher points out that the court had discretion to allow her to present the facts or data supporting Harter's opinion when Habscheid brought his second motion to exclude Harter's testimony. Yet, the court was not required to and did not, in fact, exercise that discretion.

The record reflects that, in response to questioning by the court, Pecher's lawyer admitted that not all the documentation had been turned over during discovery. This suggests (1) that the documents were requested and (2) that they were not turned over. As a result, the documents could have been excluded under MCR 2.313(C)(1) based upon the failure to disclose. The failure to turn the documents over during discovery provides an alternative basis for the court to exclude Harter's testimony. Further, the record reflects that Pecher was on notice that Habscheid was objecting on the basis that the requirements of MRE 703 had not been satisfied, and the court advised that the facts Harter was basing his opinion on needed to be admitted into evidence. Pecher, however, made a time-saving decision to not repeat the information that she provided to Harter during her own testimony. And she made the decision not to gather and submit the documentation provided to Harter to the court as an exhibit, ostensibly because doing so would have been arduous. The court did not abuse its discretion by declining to use MRE 611(a) to relieve Pecher of the consequences of her incautious tactical decision.

## III. PROPERTY DISTRIBUTION

### A. STANDARD OF REVIEW

The parties raise several challenges to the trial court's findings related to the distribution of the marital estate. This Court reviews for clear error a trial court's factual findings related to the distribution of the marital estate. *Cassidy v Cassidy*, 318 Mich App 463, 477; 899 NW2d 65 (2017). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made." *Id*. (quotation marks and citation omitted). When the trial court's factual findings are upheld, this Court must consider whether, under the circumstances, the property division "was fair and equitable." *Id*. (quotation marks and citation omitted). The trial court's property-distribution decision must be affirmed "unless this Court is left with a firm conviction that the division was inequitable." *Id*. (quotation marks and citation omitted).

### B. ANALYSIS

#### 1. VALUATION OF LAW PRACTICE

The trial court has a duty to "make specific findings of fact regarding the value of each disputed piece of marital property awarded to each party in the judgment." *Woodington v Shokoohi*, 288 Mich App 352, 364-365; 792 NW2d 63 (2010). "[A] trial court clearly errs when it fails to place a value on a disputed piece of marital property." *Olson v Olson*, 256 Mich App 619, 627-628; 671 NW2d 64 (2003).

At trial, Pecher argued that her law practice was a niche practice that nobody would purchase and suggested that its only value was its cash assets. She testified that, as of May 31, 2019, the date she filed her complaint for divorce, the business bank accounts (located in Michigan and Germany) had a total balance of $134,760. She opined that $67,380 of the cash should be kept from the property settlement for future operating costs. In turn, Habscheid testified that a proper way to value the law practice would be to use its three-year average gross profits. He calculated the business's gross profits for the years 2017, 2018, and 2019 by looking at its tax returns and the revenue flow depicted in its bank statements. When necessary, he used the average exchange rate for each year to convert sums stated in euros to U.S. dollars. Overall, based upon his calculations, the three-year average gross profit for the law practice was $287,512.81.

After setting forth the parties' positions as to the value of the law practice, the court held:

> It is reversible error for a court to fail to value a business interest. Valuing a professional practice involves the same considerations as most other closely held businesses. A professional practice should be valued at its going-concern value that assumes the owner will continue to run the business unless evidence indicates that the owner intends to discontinue the business. The Court will use the method identified in *McNamara* [*v McNamara*, 178 Mich App 382; 443 NW2d 511 (1989), mod on other grounds 436 Mich 862 (1990)], and take the three-year average gross profit as the value of [Pecher's law practice] . . . .

> [Pecher's] law firm therefore has a value of $287,512.81 . . . .

On appeal, Pecher complains that the trial court did not use the method identified in *McNamara* because the *McNamara* opinion did not identify a three-year-average gross profit as a specific method to value the law practice. Yet, *McNamara* neither identified a particular method that a court must use when valuing a law practice, nor did it state that valuing a law practice using a three-year-average gross profit was improper. See *id*. at 392-393. Indeed, it is well-established that there are many ways for a trial court to determine the value of disputed property. *Olson*, 256 Mich App at 627. Relevant to a professional practice, this Court has explained if the owner is not going to discontinue the practice, then "the valuation of the practice should be the value of the practice to [the owner] as a going concern." *Kowalesky v Kowalesky*, 148 Mich App 151, 157; 384 NW2d 112 (1986). Likewise, in *McNamara*, the Court held that, regardless of the valuation method used, "a valuation of [a professional] practice should amount to its value to [the business owner] as a going concern." *Id*. at 393.

The value of a practice as a going concern appears to be similar to a holder's interest. As explained in Cunningham, *Equitable Distribution and Professional Practices: Case Specific Approach to Valuation*, 73 Mich B J 666, 667 (1994):

> Applying the holder's interest measure of value to a personal service business such as a professional practice is simply an extension of the principles of case specific valuation commonly used by trial courts in dividing marital assets under equitable distribution principles. Stripped to its core, the holder's interest value means that:

(1) If an interest in a personal service business is worth considerably more to the owner (a) under the assumption that he or she will continue to operate the business—and accordingly, continue to reap the financial benefits it provides, than (b) assuming the owner will sell the business to a third party (*i.e.,* [Fair Market Value] FMV,

(2) then the appropriate value for divorce settlement purposes, that is, for determining the offsetting amount of cash or value of other property for the nonowners spouse, is the value to the owner, not the lower FMV.

This is not a radical departure from the case specific methods of valuation for divorce settlement purposes that have evolved and become generally accepted . . . . Rather, adoption of the holder's interest measure of value simply brings into conformity the valuation of personal service businesses with the way most other marital assets have been valued for years.

In this case, the court's statement that it was using the method identified in *McNamara* appears to be a reference to the fact that the value should be determined based upon its value to Pecher as a going concern, rather than on its value to a hypothetical third-party buyer. Given that there was no indication that Pecher intended to discontinue her law practice, and her position that the business had no sale value to a third party, the court's finding that it should be valued at a going concern was not erroneous, nor was its reliance on *McNamara*.

Next, to determine the law practice's value to Pecher, the court found it appropriate to rely upon Habscheid's testimony that the business's three-year-average gross profit was $287,512.81. The court's decision to use the method suggested by Habscheid was within the range of proofs. "[W]here a trial court's valuation of a marital asset is within the range established by the proofs, no clear error is present." *Jansen v Jansen*, 205 Mich App 169, 171; 517 NW2d 275 (1994).

Pecher next argues that Habscheid improperly inflated the gross profits for her business. Pecher has not directed this Court to any evidence admitted during the trial indicating that those numbers were erroneous. In contrast, Habscheid submitted documentation, such as bank statements and partial tax returns for the law practice, in support of his analysis. Further, he testified at length that the net profits were inaccurate. He explained that, based upon his familiarity with the law practice, the business had "very, very small fixed costs." He also presented evidence suggesting that Pecher was improperly claiming personal expenses as business expenses. Overall, he opined that approximately $61,000 in expenses were "a private flow back." Thus, although Pecher complains that Habscheid's numbers are inflated, the documentation submitted by Habscheid supports that the gross profits are accurate, and Habscheid's testimony supports a finding that the net profits were likely inaccurate. The court, therefore, did not clearly err by relying upon Habscheid's documentary evidence.

Pecher also argues that she makes approximately $54,000 in wages and that, in addition to her net business profits, she only earns in the "low to mid $100,000s each year in income." At trial, Habscheid testified that Pecher paid herself approximately $54,000 in wages. Therefore, evidentiary support exists for this portion of Pecher's argument. However, Habscheid did not agree that Pecher's net profits were accurately calculated. In any event, in support of her argument

that she makes in the low to mid $100,000s per year, Pecher directs this Court to Harter's testimony regarding how much she made between her income and net profits in 2017, 2018, and 2019. That testimony, however, was excluded by the trial court under MRE 703. Pecher has not pointed to any admitted evidence in support of her claim that her income plus net profits was in the low to mid $100,000s each year. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). This portion of her argument, therefore, is abandoned.

Pecher also argues that the trial court improperly allowed Habscheid to "double dip" when it awarded him half of money in the business accounts and half of the business's value as a going concern. She presents no legal authority in support of her position. As a result, this Court should consider her argument abandoned. See *id*. Even if this Court were to consider her argument, it does not appear that relief is warranted. Her argument in the trial court was that the business should be valued by reference only to the money in the accounts (minus approximately $67,000 that she wanted to retain for operating expenses). The court did not adopt that approach to value. Instead, it valued the business as a going concern, using its three-year average gross profits. Thus, the award of 50% of the business value was not linked to the money that was in the business bank accounts. On this record, therefore, Habscheid was not twice compensated for the value of the law practice. Rather, he was compensated once for the money earned during the marriage and once for the future value of the law practice, which Pecher intended to continue operating.

## 2. TAX REFUNDS

In his cross-appeal, Habscheid argues that the trial court clearly erred by failing to include tax refunds as part of the marital estate. "Generally, assets earned by a spouse during the marriage, whether they are received during the existence of the marriage or after the judgment of divorce, are properly considered part of the marital estate." *Woodington*, 288 Mich App at 364; 792 NW2d 63 (2010). Tax benefits—such as the right to a tax refund—may be divided as marital assets. See *Burkey v Burkey*, 189 Mich App 72, 75; 471 NW2d 631 (1991).

Habscheid presented evidence that, between 2017 and 2019, Pecher prepaid her approximately 43,000 euros on her German taxes. In support, he submitted bank statements showing payments to "Steuerverwaltung," which he stated is the German version of the IRS. He testified that because Pecher did not earn significant[3] income in Germany, the prepayments were actually overpayments for which she would be refunded once she filed an amended tax return. When asked how he knew that the money would be refunded, he stated that he had personal

---

[3] Habscheid explained that Pecher's 2018 tax returns showed that she earned 21,264.72 euros in revenue in Germany. However, he explained that was incorrect because her actual revenue earned in Germany was only 70 euros. He explained that he went through "every single transaction that was in the bank accounts" and then compared that with the times that Pecher was in Germany in 2017. Based upon that information, he extrapolated that there were only three transactions that were taxable in Germany.

knowledge of the German tax system based upon running a "pretty big" corporation for five years. Habscheid added that two tax refunds, totally approximately 15,500 euros, had already been received by Pecher . In support, he provided two bank statements: one dated October 1, 2019, that showed a refund of 871.64 euros on September 26, 2019, and one dated January 2, 2020, that showed a refund of 14,873.07 euros. Habscheid added that once the money was refunded there would be tax liability in the United States.

On rebuttal, Pecher testified that she did not decide to deliberately overpay her German taxes. She stated that the German IRS automatically takes out the pre-payments. She testified that, contrary to Habscheid's representation on Exhibit N9, she was not receiving $51,000 in tax refunds; rather, it was "like, $20,000 U.S. dollars, converted." She added that the amount returned in September and December 2019 was the only amount expected to be returned. Thereafter, in her closing argument, she again acknowledged receiving tax refunds in September and December 2019.

Following the parties' closing arguments, the trial court found:

[Habscheid] argues that [Pecher's] law firm overpaid German taxes. [Habscheid] offered his analysis as to how [Pecher] would regain that money. However, this Court finds this speculative and will not consider amounts already paid to be part of the marital estate.

Based upon the record before this Court, the trial court clearly erred with regard to the tax refunds that were actually received by Pecher. Habscheid submitted bank statements showing that approximately 15,500 euros were refunded to Pecher in September and December 2019. Pecher, thereafter, confirmed that she had received the refunds. Therefore, contrary to the court's finding, the refund amount received in September and December 2019 is not speculative. Further, based upon Habscheid's uncontested testimony that the prepayments were made with money earned during the marriage and prior to the filing for divorce, there is no basis upon which to conclude that the tax refunds already received were not part of the marital estate.

The trial court, however, did not err in finding speculative Habscheid's argument that Pecher would receive additional tax refunds in the future. Pecher testified that she was not deliberately overpaying German taxes and that she did not expect to receive additional refunds. Habscheid testified that Pecher's German tax returns incorrectly overstated her income, that she had four years to amend the returns, and that when the returns were amended she would receive the amount she prepaid as a tax refund. He acknowledged that his analysis depended upon his personal knowledge of the German tax system. Moreover, Habscheid testified that if there were a refund, it would result in tax liability in the United States. The trial court was not required to credit Habscheid's lay opinion testimony. "We defer to the trial court's credibility determinations given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809

NW2d 435 (2011). On this record, the court did not clearly err by finding speculative Habscheid's testimony that Pecher would receive future tax refunds.[4]

In sum, because the trial court clearly erred by not including the tax refunds actually received in September and December 2019 as part of the marital estate, we reverse that part of the court's order and remand to the trial court. On remand, the trial court should calculate the value of the tax refunds received and shall enter an order awarding half of the value to Habscheid.

### 3. ACCOUNTS RECEIVABLE

Habscheid next argues that the trial court erred by not distributing delayed accounts receivable that were discovered during the trial. Habscheid argues that Pecher fraudulently concealed the accounts receivable; however, he also admits that his information on the accounts comes from information that was disclosed to him and his lawyer during the trial. The documentation—which had been provided to Harter so that he could value Pecher's law practice— was not admitted into evidence during Pecher's case-in-chief. Later, when Pecher sought to reopen the proofs to admit the facts and data supporting Harter's opinion, Habscheid successfully objected to and was able to keep the documentation from being admitted into evidence. Having successfully prevented the documentation from being admitted into evidence, Habscheid is not now entitled to appellate relief on the basis that the documentation he objected to would have supported his argument that there were thousands of dollars in accounts receivable. To do otherwise would be to allow Habscheid to harbor error as an appellate parachute. See *Hoffenblum v Hoffenblum*, 308 Mich App 102, 117; 863 NW2d 352 (2014) (quotation marks and citation omitted) ("A party may not claim as error on appeal an issue that the party deemed proper in the trial court because doing so would permit the party to harbor error as an appellate parachute.").

The trial court found that the evidence admitted at trial on the issue of accounts receivable was speculative. Habscheid testified that he saw a "big stack of invoices" on Pecher's desk in 2019. After she told him that she filed for divorce, the stack of invoices was gone. He surmised that Pecher was not billing "because she's pulling this money back." In an attempt to show that she delayed the accounts receivable, he pointed out that the June and July 2019 cash flow was $43,431.24 higher than the same period in 2018. Based upon that, and the fact that Pecher's clients usually take approximately two months to pay, he opined that the billing "was delayed past [the] divorce filing date." There are, however, many reasons that a business's revenue flow may be higher or lower year to year over the same months. In sum, Habscheid's testimony was that he saw invoices, that the invoices disappeared after Pecher filed for divorce, and that the revenue in

---

[4] We note that, on appeal, Habscheid has directed this Court to a so-called admission by Pecher that she received tax refunds of approximately $40,000 "over the course of the year" in 2020. However, review of the relevant citation shows that the "admission" was a statement made by Pecher's lawyer during a motion hearing. Habscheid also relies upon questions Pecher's lawyer asked him during cross examination. Statements and questions made by a lawyer are not evidence, however. See *People v Johnson*, 382 Mich 632, 649; 172 NW2d 369 (1969). Thus, there is no evidentiary support for his suggestion that approximately $40,000 in tax refunds had been actually received by Pecher.

one year was higher than it was the previous year. On this record, the trial court did not clearly err by finding speculative his testimony that there was approximately thousands of dollars in delayed accounts receivable.

## 4. BROKERAGE ACCOUNTS

Pecher challenges the trial court's decision to value the parties' brokerage accounts using the date of the divorce rather than the date of the filing for divorce. This Court reviews for an abuse of discretion a trial court's decision regarding the time for valuing a marital asset. *Gates v Gates*, 256 Mich App at 427; 664 NW2d 231 (2003).

"Where the court determines that a particular asset is, in fact, a marital asset, it must then value the asset as of either the date of trial, the date of judgment, or a more appropriate date." *Byington v Byington*, 224 Mich App 103, 114 n 4; 568 NW2d 141 (1997). The selection of a valuation date is subjective and open to many possibilities. See *id*. Here, the trial court reasonably used the date of trial as a valuation date. The court recognized that the value of the brokerage accounts could change on any day. Accordingly, when valuing the accounts, the court indicated that it would value them "as they can be determined by the submitted evidence." The court noted that Pecher's exhibits indicating the value of the brokerage accounts did not include "date of filing values" and was "not supported by documentary evidence." In contrast, the court found Habscheid provided documentation showing the increase in value as of the date of trial. Consequently, the court found it fair and equitable to include gains and losses as of the trial date. We conclude that the court did not abuse its discretion by valuing the brokerage accounts using the date of trial because there was credible evidence indicating its value as of that date.

Pecher nevertheless asserts that the date of filing should have been used because the objects of matrimony had been destroyed by the time of filing. In support, she directs this Court to the decision in *Thompson v Thompson*, 189 Mich App 197; 472 NW2d 51 (1991). In that case, this Court concluded that the trial court did not err by using the filing date to value an asset because "the court specifically found that the objects of matrimony had been irreconcilably destroyed by the time the complaint was filed." *Id*. at 199. Here, the court made no such finding. Rather, the court considered the parties' past relations and conduct in connection with the property division. Pecher argued to the trial court that, in light of Habscheid's fault, the court should divide the marital estate 55-45 in her favor. The court rejected her position. In doing so, the court found that the relationship began to breakdown in 2015 to 2016, but that the parties disputed the cause. The court noted that Pecher testified concerning domestic abuse occurring in 2017 and 2019, and that Habscheid had been charged as a result of the 2019 incident. The court also acknowledged Pecher's testimony that Habscheid had threatened to—and did, in fact—make complaints against her for violating German and U.S. laws regarding insurance and taxes. Further, the court found that the parties arguments and behaviors had worsened as the divorce progressed. Although not explicitly stated by the court, it is clear that the court found that both parties contributed to the breakdown of the marriage and that both had increasingly worsening arguments and behaviors as the divorce progressed. Thus, although Pecher presents it as established fact that Habscheid is at fault for the breakdown, the trial court did not find either party to be more at fault. Pecher's reliance on *Thompson*, therefore, is misplaced.

## 5.  GERMAN STATUTORY PENSION

The trial court awarded Pecher her German statutory pension, the RVW, free and clear of any claim by Habscheid, but required her to equalize its marital value.  Pecher argues that the trial court clearly erred because, under "German law" and the provisions of the RVW, Habscheid will nevertheless receive his marital share (totaling 179.04 euros) of the RVW when he is 66 ½ years old.  We disagree.

At trial, documentation from the RVW plan administrators, and certified translations of that documentation, was admitted.  Relevant to the argument raised on appeal, Exhibit E18, a letter from the RVW to Pecher provides:

Dear Attorney Mrs. Pecher,

We refer to the telephone conversation between you and our employee . . . as well as your e-mail from the 05/25/2020 and enclose the calculation of the pension rights equalization.

During your marriage from 12/01/1999 to 05/31/2019, you have acquired the entitlement to an old-age pension pursuant to § 20 and an orphan's pension pursuant to § 26, insofar as these are children from the marriage to the member, in conjunction with § 37 of the statutes of the Saxony Lawyers Pension Fund.  An explanation and calculation of the individual values for the internal division is attached as Annex 1 and 2.  In the case of the entitlement to be transferred, the person entitled to equalization is not granted the same risk protection as the person liable to equalization (§ 11(1) no. 3 supply equalization act).

There are no other entitlements—even minor ones.  The current statutes of our pension fund can be found on our homepage: www.s-r-v.de under "About us"/Legal basis and we have provided the above information correctly and completely to the best of our knowledge and belief.

Appendix 1 to the letter included the following chart:

| Marital pension entitlement according §22, sect. 1 of the charter | |
| --- | --: |
| 73.00 Euro x 276.9939 months x 0.2125/12 months | 359.07 Euro |
| Proposed settlement value | 179.04 Euro |
| The corresponding net present value of the proposed settlement value is calculated by dividing the product of the proposed settlement value and the annual statutory contribution at the end of the marriage by the pension increase amount at the end of the marriage. | |
| 179.04 Euro x 13,726.80 Euro / 73.00 Euro | 33,666.39 Euro |

The parties dispute the meaning of Exhibit 18E.  At trial, Pecher testified that regardless of how the trial court orders the RVW split, when Habscheid turns 66 ½ years old, he will receive a

monthly benefit from the RVW.[5]  On appeal, she suggests that Habscheid "actually admitted that he was going to be collecting his share of [her] pension when he turned 66 1/2 " and that "he was just upset that he would not *if* [Pecher] somehow became disabled before she retired, and [he] did not want to take on this risk."  However, she mischaracterizes Habscheid's testimony.  He testified repeatedly that there were multiple ways to divide the pension.  One option, would be his receipt of a monthly benefit once he turned 66 ½ years old.  However, he pointed out that the documentation showed that that the current value of his share of the RVW was 33,666 euros.  Thus, another option would be for the value to be equalized and for him to be "kicked out" of the RVW.  He suggested that, once the trial court made a ruling, the parties would have to take the order to the RVW, which would then "do the split based on what the Judge awards."  In light of the factual dispute regarding the manner of dividing the RVW, the trial court's decision to award Pecher her RVW pension free and clear of any claim of Habscheid implies that the court found credible Habscheid's testimony that there were multiple ways to ensure that he received his marital share of the RVW.  That implicit factual finding is not clearly erroneous.

Nevertheless, Pecher's also suggests that this is a matter of law, not a factual dispute.  Her argument presumes that under "German law" there is no possibility that Habscheid can be prevented from receiving a 179.04-euro-per-month share of her RVW pension.  She never identifies the German law, however.  Exhibit E18 references statutory provisions related to the RVW.  But Pecher provides no analysis suggesting that any of the cited provisions actually state that Habscheid cannot receive his share of the pension in the form of a property-equalization award and that such a distribution would preclude him from later receiving a monthly benefit.  Because Pecher has failed to support her argument that "German law" and the RVW plan will award Habscheid a share of her RVW despite the judgment of divorce awarding her the RVW free and clear of any claim of Habscheid, we conclude that this argument is abandoned on appeal.  See *Mitcham*, 355 Mich at 203.

## 6.  MARITAL HOUSE

Prior to trial, the parties entered into a partial property agreement.  The agreement provided that Pecher was "awarded the parties' marital home . . . free from any claim of" Habscheid and Habscheid was to receive the office building free and clear of any claim of Pecher.  The parties further agreed that Pecher would refinance the mortgage to remove Habscheid's name from the underlying mortgaged indebtedness and that Habscheid would sign a quit claim deed conveying his interest to Pecher.  Habscheid, Pecher, and Pecher's lawyer signed the agreement, and the court entered an order recognizing the parties' stipulation.  Later, the parties entered into a second stipulation regarding the marital home and the personal property located on the property.  That agreement reaffirmed that Habscheid would sign a quit claim deed "relinquishing all interest and right in the" marital home, and it clarified that the quit claim deed would only apply to the real estate, not to any personal property.  Around the same time, Habscheid signed an affidavit for the mortgagee bank that provided that he "has no interest, including any spousal or homestead rights,

---

[5] We note that Pecher's testimony is contrary to her trial exhibit 31, which included a type-written notation: "German Pension, [Habscheid] can buy out per German pension plan if we agree, otherwise he gets 174 Euro per month at the time he turns 66 ½ years old."

as defined by the law of the State of Michigan, in the [marital home], which is not [Habscheid's] residence." Months later, Habscheid filed a motion seeking to set aside the partial property settlement. Habscheid argued that he and Pecher were unable to agree to the house's value and that he was willing to offer and pay more than the appraised valuations proposed by Pecher. The court denied the motion.

Now, Habscheid complains for the first time that the court should have set aside the partial property settlement because of fraud or misrepresentation. We conclude that this issue was waived because it was not raised before the trial court. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Moreover, even if we were to consider the issue, we would conclude that there is no merit to Habscheid's argument. He contends that Pecher engaged in misconduct, but he does not identify any false, material misrepresentations that Pecher made related to the partial property settlement. See *Foreman v Foreman*, 266 Mich App 132, 141-142; 701 NW2d 167 (2005) (stating that to prove fraudulent misrepresentation the plaintiff must prove several elements, including that the defendant made a false, material misrepresentation). Further, Habscheid also asserts that he never understood or intended that his agreement would mean that he would actually have to give up his claim to the home. If he had such beliefs, however, they were not reasonable. The stipulation provided that the marital home was being awarded to Pecher "free and clear of any claim of" Habscheid. A second stipulation entered into the record clarified that he was only relinquishing his claim to the real property, not the personal property. Further, he signed an affidavit that unequivocally stated that he had no interest in the marital home. Finally, after his unsuccessful motion to set aside the agreement, he relied upon it as a basis for his—successful—attempt to prevent Pecher from refinancing the property for a second time. In light of the above, his assertion that he did not understand that he was giving up his claim to the marital home lacks merit.

Next, Habscheid argues that if the partial property settlement is not set aside, then the marital house should be treated as Pecher's separate property. If the agreement is not set aside, however, then, under the terms of the agreement, the home is marital property. Thus, there is no basis upon which to treat it as separate property.

Habscheid also asserts that the property should have been valued using "holder's interest" as the value and that the court clearly erred by using the average of the three appraisals submitted by the parties. As noted above, there are many ways for a court to determine the value of property to be awarded in a judgment of divorce. *Olson*, 256 Mich App 627-628. Here, the value was disputed. Habscheid presented evidence that the marital home was worth $510,000, and Pecher presented appraisals showing that it was worth $425,000 or $431,000. The court's decision to average the three appraisals to determine the value was not clear error. Moreover, in the partial property settlement, Habscheid agreed that appraisals or other methods could be used to determine the property's value, and in his written closing he argued that the court should either use the $510,000 appraisal or should order the property sold. Having argued that one method of valuing the property would be to rely upon the real estate appraisals, he should not now be heard to complain that the court opted to use appraisals to value the property. See *Hoffenblum*, 308 Mich App at 117.

Habscheid lastly contends that the distribution of the home to Pecher resulted in an inequitable distribution because Pecher cannot afford to pay him the property equalization sum.

This argument is without merit. In 2019, Habscheid signed a partial property settlement agreement stating that the home would be awarded to Pecher, with 50% of the property's value as determined by the parties or the court being awarded to him. He later signed an affidavit relinquishing his claim to the property, and he relied upon the property settlement agreement to obtain relief against Pecher during the divorce. The distribution of the property in accordance with that agreement was not inequitable.

## 7. PERSONAL PROPERTY

Habscheid also challenges the trial court's initial order relating to the division of the parties' personal property. That order directed the parties to keep the property currently in their possession, but ordered them to also pick a time and place to exchange any items they could agree belonged to the other. The court awarded a child's bicycle to Pecher and awarded Habscheid his cider-making equipment. The court directed that if the parties were unable to reach a resolution, they could "come back to the court." Habscheid argues that the court erred because (1) the court did not assign a value to the personal property, and (2) the court left 72% of the appraised value in Pecher's possession. The problem with Habscheid's argument is that the trial court left open the possibility that the parties could return if they were unable to reach a resolution on the personal-property issue.

The parties were, in fact, unable to agree. On March 10, 2022, Habscheid filed a motion to distribute personal property. In the motion, he alleged that at the time of the divorce trial, Pecher had 72% of the parties' personal property in her control and that, despite being ordered to give him his cider-making property, she had not turned it over to him. He also requested that he receive several items valued at $5,655. In his request for relief, he requested that he either receive the items or that Pecher be ordered to equalize the value of the personal property. In response, Pecher argued that a payment to her was required to equalize the personal property. Thereafter, the trial court entered an order indicating that the parties had agreed to exchange certain items, and it directed that the items be collected within 30 days.

Habscheid filed a motion for reconsideration, arguing only that he should receive all the items on his "cider" list and his "orchard" list and asking the court to order mediation on the remaining disputed personal property or that they keep the items in their possession. He did not ask the court to value the personal property or to equalize its value. Pecher also moved for reconsideration, requesting personal property in Habscheid's possession, and she requested half of the value of personal property that had been abandoned in the Sanford office building. The trial court ordered that no money was to be exchanged between the parties relevant to the collection of personal property and ordered Habscheid to arrange for a storage unit to be set up for the exchange of items.

Given that Habscheid had been awarded additional property, the parties are no longer requesting an equalization of value, and the court has, in fact, ordered that no exchange of money shall occur regarding the personal property, Habscheid's arguments on appeal, all of which challenge to the court's initial order, are moot. See *Kieta v Thomas M Cooley Law Sch*, 290 Mich App 144, 147; 799 NW2d 579 (2010) ("A matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy.") (quotation marks and citation omitted).

-15-

## IV. ATTORNEY FEES

### A. STANDARD OF REVIEW

Habscheid preserved this issue by filing a postjudgment motion for attorney fees under MCR 3.206(D)(1)(a) and by requesting appellate attorney fees. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). On appeal, Habscheid argues that the court abused its discretion by denying his request for $60,000 in attorney fees. He does not argue that the court erred by denying his request for appellate attorney fees. The court's decision to deny a request for attorney fees in a divorce action is reviewed for an abuse of discretion. *Cassidy*, 318 Mich App at 479. "An abuse of discretion occurs when the result falls outside the range of principled outcomes." *Id.* The court's factual findings related to a request for attorney fees are reviewed for clear error. *Id.* "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Gates*, 256 Mich App at 432-433.

### B. ANALYSIS

In Michigan, attorney fees are not recoverable unless expressly allowed by statute, court rule, common-law exception, or contract. *Reed*, 265 Mich App at 164. In a divorce action, attorney fees are permitted under both statute and court rule. *Id.* Under MCL 552.13(1), "the court may require either party . . . [to a divorce action] to pay any sums necessary to enable the adverse party to carry on or defend the action, during its pendency." Although MCR 3.206(D) states that a request for attorney fees may be made "at any time," this Court has clarified that the motion must nevertheless "be brought within a reasonable time after the fees sought were incurred[.]" *Colen v Colen*, 331 Mich App 295, 304; 952 NW2d 558 (2020). Whether a particular time is reasonable or not "depends on the particular facts and circumstances of each case." *Id.* The party requesting fees must allege facts sufficient to show that "the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay[.]" MCR 3.206(D)(2)(a).

When considering a need-based request for attorney fees, the trial court should determine if attorney fees are needed for that party to defend his or her suit. *Myland v Myland*, 290 Mich App 691, 703; 804 NW2d 124 (2010). The court should also consider whether, under the circumstances, paying attorney fees would require that party to invade assets needed for support and whether the other party has "the ability to pay or contribute" to those attorney fees. *Id.* Further, "[t]he trial court must give special consideration to the specific financial situations of the parties and the equities involved." *Skaates v Kayser*, 333 Mich App 61, 85; 959 NW2d 33 (2020). But a court may not decline to award attorney fees "solely on the basis of what it perceives to be fair or on equitable principles." *Reed*, 265 Mich App at 166.

Based upon the record, we conclude that although Habscheid offered some evidence in support of his request for attorney fees, he nevertheless failed to meet his burden of submitting sufficient facts to justify the award. See *Skaates*, 333 Mich App at 85 (holding that the denial of attorney fees is proper if the party requesting the fees fails "to offer any evidence outlining the details of his attorney fees, such as hourly rate, number of hours worked, and the experience level of his attorney."). Regarding the first lawyer, he provided details showing her hourly rate, the services rendered, and the number of hours worked. He then speculated that he incurred $1,500

in attorney fees—which would amount to 6 hours of work at $250 per hour—related to the domestic-violence charge. Despite providing a detailed billing statement from his first lawyer, he did not point to any specific time charges to support that assumption.[6] Then, as it relates to his second lawyer, he provided documentation detailing only 3.3 hours of worked and an hourly rate of $300. The balance of the documentation supporting the request for attorney fees from the second lawyer were nothing more than summaries showing the amounts billed and/or paid. Ultimately, the essence of Habscheid's arguments, both below and on appeal, is that it would be financially fair to require Pecher to pay a portion of his attorney fees simply because her earning ability is significantly more than his. That is not, however, the law in Michigan. As a result, we conclude that Habscheid did not meet his burden of submitting sufficient facts to justify the award. Consequently, the trial court did not abuse its discretion by denying the motion for attorney fees.

## V. CHILD-SUPPORT CALCULATIONS

### A. STANDARD OF REVIEW

Pecher argues that the trial court erred by failing to impute income to Habscheid and by using her businesses three-year average gross profits to calculate child support.

> Whether the trial court properly applied the Michigan Child Support Formula (MCSF) to the facts of the case is a question of law that this Court reviews de novo. *Burba v Burba (After Remand)*, 461 Mich 637, 647; 610 NW2d 873 (2000). This Court also reviews de novo the proper interpretation of the MCSF and the applicable statutes. *Atchison v Atchison*, 256 Mich App 531, 534-535; 664 NW2d 249 (2003). This issue also involves review of matters committed by the MCSF to the discretion of the trial court. Where the MCSF commits a matter to the discretion of the trial court, this Court will review the trial court's exercise of discretion for abuse. *Burba*, 461 Mich at 649, (holding that the trial court abused its discretion by deviating from the formula for a legally improper reason). An abuse of discretion occurs when a court selects an outcome that is not within the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). Finally, to the extent that the trial court made factual findings in determining the amount of support under the child support formula, those findings are reviewed for clear error. *Beason v Beason*, 435 Mich 791, 805, 460 NW2d 207 (1990). [*Borowsky v Borowsky*, 273 Mich App 666, 672; 733 NW2d 71 (2007).]

### B. ANALYSIS

"The Michigan Legislature has required that when a court orders child support as part of a divorce judgment, 'the court shall order child support in an amount determined by application of

---

[6] Although the first lawyer's description of some of the time charges clearly relate solely to the domestic-violence case, the lawyer's tendency to list lengthy time charges using vague descriptive phrases—such as "call to client"—make it impossible to ascertain the exact number of hours she spent on the divorce proceedings and which hours she spent on the domestic-violence.

the child support formula developed by the state friend of the court bureau' unless to do so would be 'unjust or inappropriate' and the trial court makes certain specified findings 'in writing or on the record . . . .' " *Stallworth v Stallworth*, 275 Mich App 282, 283-284; 738 NW2d 264 (2007), quoting MCL 552.605(2). As a result, "a trial court must presumptively follow the Michigan Child support Formula (MCSF)." *Stallworth*, 275 Mich App at 284.

Pecher argues that the trial court's finding that it was appropriate to use the numbers from the judgment of divorce to calculate the child-support obligation was erroneous. The judgment of divorce relied upon the court's opinion and order on the property division. In that opinion, the court found that the "three-year average [gross] profit of [Pecher's] 2017, 2018, and 2019 tax returns is $287,512.81 per year in her legal practice," and that the "three year average [gross] profit" of Habscheid's internet marketing and consulting businesses was "$43,955.33 per year." In response to a postjudgment motion to determine child support, Pecher argued that it was improper to use her gross business profits and she argued that there was a factual basis to impute income to Habscheid. The trial court, however, ruled that it was going to base the child-support order "off the numbers that were used in the Judgment of Divorce so you can get the order entered, so you have a final order so you can move forward with the appeals." Thereafter, the court entered an order stating that the child-support order should "use numbers from judgment of divorce."

On appeal, Pecher suggests that, to resolve the issue, the trial court needed to make findings as to her net income under 2021 MCSF 2. She is correct. "[T]he first step in determining a child-support award is to ascertain each parent's net income by considering all sources of income." *Stallworth*, 275 Mich App at 284; see also 2021 MCSF 2. The term "net income" is defined as "all income minus deductions and adjustments permitted by this manual." 2021 MCSF 2.01(A). Income is broadly defined to include wages and "[e]arnings generated from a business, partnership, contract, [or] self-employment." 2021 MCSF 2.01(C)(1)-(2). The MCSF cautions that income from corporations "should be carefully examined to determine the extent to which they were historically passed on to the parent or used merely as a tax strategy." *Id*. No such careful examination occurred in this case.

Moreover, with regard to self-employed individuals and business owners, 2021 MCSF 2.01(E) expressly provides:

(1) Difficulty in determining income for self-employed individuals, business owners, and others occurs for several reasons.

(a) These individuals often have types of income and expenses not frequently encountered when determining income for most people.

(b) Taxation rules, business records, and forms associated with business ownership and self-employment differ from those that apply to individuals employed by others. Common business documents reflect policies unrelated to an obligation to support one's child.

(c) Due to the control that business owners or executives exercise over the form and manner of their compensation, a parent, or a parent with the cooperation

of a business owner or executive, may be able to arrange compensation to reduce the amount visible to others looking for common forms of income.

(2) In order to determine the monies that a parent has available for support, it may be necessary to examine business tax returns, balance sheets, accounting or banking records, and other business documents to identify any additional monies a parent has available for support that were not included as personal income.

\* \* \*

(4) For purposes of this subsection, income includes amounts that were not otherwise included as income elsewhere in this chapter. Pay special attention to the following forms of compensation:

(a) Distributed profits, profit sharing, officers' fees and other compensation, management or consulting fees, commissions, and bonuses.

(b) In-kind income or perquisites (§2.01(D)), gifts, free admission to entertainment, or personal use of business property. (Determine the value based on a fair market price, i.e., the price a person not affiliated with the business would pay).

(c) Redirected income, or amounts treated by the business or company as if the redirected amounts were something other than the parent's income. Amounts include, but are not limited to

(*i*) Personal loans. . . .

(*ii*) Payments made to friends or relatives of the parent. . . .

(d) Reduced or deferred income. Because a parent's compensation can be rearranged to hide income, determine whether unnecessary reductions in salaries, fees, or distributed profits have occurred by comparing amounts and rates to historical patterns.

(*i*) Unless the business can demonstrate legitimate reasons for a substantial reduction in the percentage of distributed profits, use a three-year average to determine the amount to include as a parent's income.

(*ii*) Unless a business can demonstrate legitimate reasons for reductions (as a percentage of gross business income) in salaries, bonuses, management fees, or other amounts paid to a parent, use a three-year average to determine the amount to include as a parent's income.

(e) Deductions for Tax Purposes. For a variety of historical and policy reasons, the government allows considerable deductions for business-related expenses before taxes are calculated. Those same considerations are not always relevant to monies a parent should have available for child support. Therefore,

some deductions should be added back into a parent's income for purposes of determining child support, including:

(*i*) Rent paid by the business to the parent, if it is not counted as income on that parent's personal tax return.

(*ii*) Real estate depreciation should always be added back into a parent's income when calculating support.

(*iii*) Depreciation on home offices and personal vehicles should be added back into a parent's income. . . .

(*iv*) Home office expenses, including rent, hazard insurance, utilities, repairs, and maintenance.

(*v*) Entertainment expenses spent by the parent. Legitimate expenses for customer's entertainment are allowable as deductions.

(*vi*) Travel expense reimbursements, except where such expenses are inherent in the nature of the business or occupation (e.g., a traveling salesperson), and do not exceed the standard rates allowed by the state of Michigan for employee travel.

(*vii*) Personal automobile repair and maintenance expenses.

Taken as a whole, 2021 MCSF 2.01(E) makes clear that a self-employed parent's income is not determined solely by reference to their businesses' net profits. Here, however, the court's opinion and order indicated that the gross profits were determined by reference to tax returns. As is clear from a cursory reading of 2021 MCSF 2.01(E), the determination as to income earned by self-employed parents is significantly more complicated than simply pulling a number from a tax return. We conclude that the trial court clearly erred by not making any findings under 2021 MCSF 2.01(E) with respect to Pecher's net income. Remand for the court to make the appropriate findings under the MCSF is warranted. The court's determination as to the parties net income should reference the applicable sections of the MCSF in order to facilitate appellate review.

Additionally, Pecher argued that the trial court should have imputed income to Habscheid. In support, she directed the court to information regarding his historic earnings ability during the marriage, his professional degrees, his representations of income under oath in relation to a lease application for a truck, and to statements he made regarding the income from his businesses in response to interrogatories. The court did not address her argument. Thus, on this record, there are no findings regarding the imputation of income that this Court can review. Remand for the court to make findings as to whether it is or is not appropriate to impute income to Habscheid is, therefore, necessary. On remand, the trial court must consider 2021 MCSF 2.01(G), which

addresses potential income arising when a parent is voluntarily unemployed or underemployed, or has an unexercised ability to earn.[7]

Affirmed in part, reversed in part, and remanded for further proceedings. Neither party having prevailed in full, no taxable costs are awarded. MCR 7.219(A). We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Douglas B. Shapiro
/s/ James Robert Redford

---

[7] On appeal, Habscheid argues that Pecher went to great lengths to conceal her income and that he proved at trial that her gross profits were close to her net profits. Although he presented some evidence at trial in support of his position, the trial court's findings following the divorce trial related to the value of the business. Those findings did not require the court to take into consideration the same information that must be considered under the MCSF when determining the net income of the parties. The fact that there may be overlap in the court's factual findings— and overlap in the evidence—does not relieve the trial court of its obligation to first determine the parties net income.